Stella S. **FUGATE**

v.

**Robert A. LeBAUBE, Acting District Director of the Internal Revenue Service, Dallas, Texas, et al.**

No. CA 3–4465–C.

United States District Court,
N. D. Texas,
Dallas Division.

March 26, 1974.

William F. Billings, Johnson, Guthrie, Billings & Pierce, Dallas, Tex., for plaintiff.

Frank D. McCown, U. S. Atty., Kenneth J. Mighell, Asst. U. S. Atty., Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This is a federal employee discharge case. The plaintiff, Stella S. Fugate, was dismissed on February 28, 1969, from her position as a tax technician (GS–9) in the Fort Worth, Texas, office of the Internal Revenue Service by the original defendant, Ellis Campbell, Jr., who was then IRS district director.

The facts underlying Mrs. Fugate's firing after seven and a half years with IRS are fairly stated in Mr. Campbell's letter to her, dated November 14, 1968. The letter was the official "notice of proposed adverse action" notifying her that she was to be removed or otherwise

disciplined in order to promote the efficiency of the government service because, to quote the letter:

Charge I: You conducted yourself in a manner unbecoming an employee of the Internal Revenue Service in that you shot through a door at your son-in-law, Billy Frank Goodson, with a 38 caliber pistol.

Continuing, the letter went into more detail about the shooting incident:

Specification 1: On July 20, 1968, at approximately 1 a. m., you went to 804 W. Seminary, taking a gun with you. Upon arriving at 804 W. Seminary, you aroused Mr. and Mrs. Billy Frank Goodson, your son-in-law and daughter, and engaged Mr. Goodson in conversation through a closed door. You then fired a shot through the door at Mr. Goodson. You left their residence and drove to nearby Hemphill Street where you called the police. When police officer J. D. Holmes arrived you told him you wanted the police to know that you were going to kill a man just down the street. You then drove off and returned to 804 W. Seminary. Officer D. B. Garland and M. L. Harper were at 804 W. Seminary when you arrived. They asked you if you had a gun and you said yes. Officer Garland found a chrome plated Smith and Wesson 38 caliber pistol, Serial # 821015, on the front floorboard of your car. Officer Harper asked if you had fired a shot at the resident of 804 W. Seminary Drive earlier and you replied yes, that you tried to kill him.

This letter was intended to notify Mrs. Fugate of the *exact reasons* for her discharge. Because I find a significant variation between the allegations of the letter and the accusations the IRS subsequently leveled against Mrs. Fugate, the effect of which was to deny her due process, I will grant her motion for summary judgment, setting aside her dismissal and granting the relief prayed for.

It will be worthwhile to review the events of the night of July 19–20, 1968, in some detail. Some of the facts are still in dispute, despite rather thorough investigations, and what follows is distilled from the lengthy agency file in this case.

Mrs. Fugate, a divorcee at the time in question, had two daughters. One of them, Suzanne, age 20, had been living with an ex-convict named Billy Frank Goodson. To understate the situation considerably, Mr. Goodson and Mrs. Fugate did not get along well with one another; they had clashed several times. Mrs. Fugate believed that Mr. Goodson was beating Suzanne and had sought police help without success. Subsequently, Suzanne admitted Mr. Goodson had abused her. Sometime before the incident in question, Mr. Goodson and Suzanne had married without Mrs. Fugate's knowledge.

It is disputed who initiated the call, but Suzanne spoke to her mother by telephone about 11:30 p. m., on July 19, 1968. Suzanne, crying, reported that Mr. Goodson had beaten her and asked her mother for help. No sooner had they hung up than Mr. Goodson phoned Mrs. Fugate, cursed her, and told her that if she came to where he and Suzanne lived, he would give her some of what he had just given Suzanne. After seeking help by phone from both her ex-husband (Suzanne's father) and the Fort Worth police, and being turned down, Mrs. Fugate drove to her mother's house where she picked up a pistol, then drove to Suzanne's. There she knocked on the door and called to Suzanne. Mr. Goodson responded with invective and Suzanne was still crying, prompting Mrs. Fugate—a novice marksman—to fire a single shot from her .38 caliber pistol through the door, leaving five unfired rounds in the pistol. Still Mr. Goodson remained behind the closed door. Again Mrs. Fugate phoned the police; this time they responded in numbers, since Mr. Goodson also had called for assistance.

Mrs. Fugate's intent when she pulled the trigger is somewhat difficult to discern. The letter from Mr. Campbell, it should be remembered, charged that she shot *at* Mr. Goodson. The police report of the incident supports that conclusion; the investigating police quote Mrs. Fugate as saying she shot at Mr. Goodson and tried to kill him. A neighbor of the Goodsons told an IRS investigator that she heard a woman standing on the Goodsons' porch say after the shot was fired, "I'm going to kill the son of a bitch." Mrs. Fugate, however, told the hearing examiner that she deliberately held the pistol high and aimed toward the ceiling. In fact, the bullet passed through a small window in the door, and a curtain, and lodged in the ceiling. She denied intending to shoot Mr. Goodson.

Mrs. Fugate was detained at the police station briefly, then released. The police and the district attorney did not file charges, and no news media reported the shooting incident. Later the same day, a Saturday, Mrs. Fugate orally reported the affray to her IRS supervisor at his home and confirmed it in writing on Monday. It appears likely to the Court that the matter might well never have come to the attention of the IRS if Mrs. Fugate had neglected to report it. She continued to work for IRS for another seven months until the effective date of her separation.

From Mrs. Fugate's report to her supervisor until she received the November 14, 1968, letter from Mr. Campbell, quoted earlier, she heard nothing official from IRS. On February 18, 1969, Mr. Campbell wrote Mrs. Fugate that he had decided to remove her, effective February 28, 1969, "to promote the efficiency of the Service." The letter also described the appellate procedure available to Mrs. Fugate. She elected to appeal through IRS channels.

Mrs. Fugate, represented by counsel, was accorded a hearing in Fort Worth on May 22, 1969, before Raymond Taylor of the IRS office in Springfield, Illinois. (Mr. Taylor, of course, is not related to the writer of this opinion.) A transcript of that hearing is before this Court. It shows that the hearing was conducted in a businesslike manner until the closing statements began. The agency representative, analogous to a prosecutor in a criminal action, was a Mr. Hunter. Not until this point had anyone accused Mrs. Fugate of a crime, but Mr. Hunter told the hearing officer: ". . . What we have here is what was supposed to have been the perfect crime. And the perfect crime was to have been murder. . . . I have no doubt that she intended to kill him, that she went over there that evening with that intent."

Perhaps Mr. Hunter had been a criminal prosecutor. At any rate, warming to his task, he continued his "jury argument" to the hearing examiner:

Mrs. Fugate committed a whole series of crimes that night. For example, the moment she picked up that gun and carried it across town, she violated Article 483 of the Vernon's Ann. Texas Penal Code which prohibits the unlawful carrying of weapons. The very fact she had that in her car was a violation of Texas law. Moreover, even assuming that she had been threatened with bodily injury, that, under Texas law, is no justification. . . . Article 1138 of the Texas Penal Code defines an assault and Article 1143 asserts that no verbal provocation justifies an assault and battery. . . . Further, Article 1151 of the Texas Penal Code provides that if an assault is committed with a pistol, the guilty party may be confined to the penitentiary for not more than five years. . . . Article 1160 of the Texas Penal Code prohibits an assault with intent to murder.

Mr. Hunter referred to several Texas court cases interpreting the statutes he cited, then continued:

Now Mr. Billings [Mrs. Fugate's attorney] is sitting over there awaiting his turn, just itching to remind you there is no charge that Mrs. Fugate is charged with a crime. . . . Now

we know perfectly well why she was let off—she had friends in the court house, city hall, or wherever they were.

Mr. Billings objected that there was no evidence that the only reason Mrs. Fugate was not prosecuted was that she had friends in positions of influence. The Court is inclined to agree with him; the "evidence" to support Hunter's argument is a letter in the agency file from the then county judge of Tarrant County (Fort Worth), Howard L. Green. The "to whom it may concern" letter simply states that Judge Green had known Mrs. Fugate for a number of years and that he could "personally vouch for her integrity, morals and honesty and would accept her word without question." Mr. Hunter then repeated, "This woman has committed a serious crime," paraphrased the biblical story of the fall of Adam and Eve, and sat down.

On July 31, 1969, the hearing examiner sent his report to the director of the IRS personnel division in Washington, A. J. Schaffer. The hearing examiner found, after reviewing the file and the evidence presented at the hearing, that the charge against Mrs. Fugate was not sustained. Mr. Hunter's extraneous argument apparently did not draw Mr. Taylor off the track, for he wrote: "The real issue in this case is not whether the appellant fired a shot through a door; or violated Texas statutes; but did she in fact shoot at her son-in-law." Mr. Taylor wrote that he believed Mrs. Fugate's version of what happened the night of July 19–20, and that he did not believe Mrs. Fugate shot *at* Mr. Goodson, as charged originally in Mr. Campbell's letter. It was not Mr. Taylor's prerogative to make a recommendation, and he made none.

The official to whom Mr. Taylor's fact-finding report was sent, Mr. Schaffer, did not agree with the hearing officer. He ruled, after reviewing the file:

. . . [I]t is my opinion that the weight of evidence supports the specification and the charge. Therefore, I find the charge sustained, and the decision by District Director Campbell [firing Mrs. Fugate] is affirmed. . . . My decision to sustain the charge and affirm the removal is made in full cognizance that Mr. Taylor does not find the charge sustained.

Mr. Schaffer agreed that the real issue was whether Mrs. Fugate shot *at* her son-in-law, but he chose to believe the version related by the son-in-law, the neighbor, and the police. None of these, it might be pointed out, was a live witness at the hearing; their statements were written and in the case of the police and the son-in-law they were unsworn.

Mrs. Fugate next pursued her appellate rights through Civil Service Commission (CSC), as opposed to IRS, channels. A CSC appeals examiner conducted a hearing in January, 1970; again Mr. Billings represented Mrs. Fugate and Mr. Hunter represented the IRS. Both counsel submitted letters or affidavits prepared before the hearing, and once again Mr. Hunter leveled charges at Mrs. Fugate which went far beyond those that supposedly underlay her discharge. Samples:

The arresting officers did their duty well enough—they charged her [Mrs. Fugate] . with unlawfully carrying arms, a criminal offense that she unquestionably committed. . . . But Jack Neal, the prosecutor, was an old family friend, and he took care of everything by simply reprimanding the appellant. . . . Surely this appellant's conduct in this instance was a gross violation of the criminal laws of the State of Texas. . . . The fact that she was able to avoid notoriety by reason of her courthouse connections detracts not at all from the seriousness of her conduct. . . . The use of gunfire to settle private grievances is a felony under Texas law, and the Internal Revenue Service will not retain any employee who engages in such flagrant misconduct as that evidenced here.

The appeals examiner concluded after reviewing "the total record" (which of course included Mr. Hunter's letter) that the evidence supported the IRS' charge; the decision to remove Mrs. Fugate was upheld.

Again Mrs. Fugate appealed, this time to the CSC's Board of Appeals and Review in Washington, D. C. The Board gave counsel for IRS an opportunity to respond to the appeal. Once again Mr. Hunter represented the agency, and once again he went beyond the original charge and specification. He wrote, in part:

> From the record before it, this Board must surely conclude that this appellant did—as charged—fire a shot through the door at Billy Frank Goodson. We believe that her conduct was inexcusable and reprehensible, and in violation of Texas criminal laws . . .

In what would ordinarily be the final step of the administrative appellate procedure, the Board of Appeals and Review reversed the IRS' discharge of Mrs. Fugate. It decided that—even though the evidence sustained the charge—removal was unwarranted and would not promote the efficiency of the service.

Elaborating, the Board explained that the shooting incident received no publicity, caused the IRS no embarrassment, and in no way affected Mrs. Fugate's competence as a tax technician. "Under the circumstances," the Board concluded, "the penalty of removal was unreasonable in that it was unduly harsh." The IRS was ordered in June of 1970 to reinstate Mrs. Fugate.

As noted above, this ordinarily would have ended the matter. "The decision of the Board is final and there is no further right of appeal." 5 C.F.R. § 772.307(c).

However, the regulations provide for a discretionary appeal to the full membership of the Civil Service Commission, and the IRS elected to petition the Commission to reopen and reconsider the Fu-

gate case. 5 C.F.R. § 772.308. The then-head of the agency, Commissioner of Internal Revenue Randolph W. Thrower, sent a letter dated July 6, 1970, to CSC Chairman Robert E. Hampton (a defendant herein). It is a fair inference that the Commissioner's letter was drafted by Mr. Hunter, for there is no indication that Mr. Thrower was personally acquainted with Mrs. Fugate or the circumstances of her case. The letter asked the CSC to reverse its Board of Appeals and Review on grounds that the Board improperly failed to apply the provisions of the Federal Personnel Manual and Civil Service Regulations to the facts of the case.

It should come as no surprise, in view of the history of the case, that the IRS continued to accuse Mrs. Fugate at this stage in the proceeding of misconduct not alluded to in the original charge. Some excerpts from the Commissioner's six-page letter illustrate that the IRS, one last chance remaining to rid itself of Mrs. Fugate, pulled out all the stops:

> The Service believes that appellant's conduct in this case was certainly criminal and probably immoral, and that her removal was thus based on a "cause" specifically recognized by the Civil Service Commission.

> The facts in the instant case indicate, beyond reasonable doubt, that appellant intended to murder Billy Goodson. . . . On the facts found by the Board we submit that appellant violated Article 1160 of the Texas Penal Code, which provides for imprisonment of from two to twenty-five years for the offense of assault with intent to murder with malice. . . .

> The Commission's regulation also provides that "immoral conduct" is a ground for employment disqualification and for adverse action. . . . The Service believes that the facts in the instant case reflect this appellant's disregard of the contemporary standards of conduct in her community, as

well as a disregard of the legal and human rights of her intended victim, and that such conduct is incompatible with the high standards of personal conduct expected of a Service employee occupying a position of responsibility and judgment.

Mr. Thrower's letter admitted that the shooting incident received no publicity, but repeated—without substantiation— "appellant plainly received exceptional treatment for personal reasons." Stating that the IRS had "little confidence of her future trustworthiness," Mr. Thrower asked the Commission to affirm her discharge.

On November 19, 1970, the three-member CSC reversed the Board of Appeals and Review and sustained the decision of its Dallas region. This decision followed the Commission's "review of all the evidence *and representations* pertinent to the case," according to the letter notifying Commissioner Thrower of the action. (Emphasis added.)

Having exhausted her administrative remedy, Mrs. Fugate filed this suit February 2, 1971, seeking reinstatement and a declaration that she was illegally fired. This Court's jurisdiction is based on 28 U.S.C. §§ 1346(a)(2) and 1361 and 5 U.S.C. §§ 701–706.

The case is before the Court on cross motions for summary judgment. Not surprisingly, the government's brief in support of its motion argues that Mrs. Fugate was guilty of "misconduct or criminal, infamous, immoral or notoriously disgraceful conduct" that justifies her discharge in accordance with 5 C.F.R. 731.201(b). Once again the government cites Texas law and accuses Mrs. Fugate of a felony—assault with intent to murder—and "immoral conduct." Later, the motion says that Mrs. Fugate's alleged attempt to kill Mr. Goodson is "a particularly reprehensible crime."

■ The government states—correctly—that the scope of review of this Court is narrow, being limited to determining whether the contested agency ac-

tion was (1) supported by substantial evidence, (2) not arbitrary and capricious, (3) done within the framework of due process of law and (4) was done to promote the efficiency of the IRS. The government does not state, but it is of course true, that a negative answer to any one of the four questions will invalidate Mrs. Fugate's firing. 5 U.S.C. § 706(2).

■ Mrs. Fugate's discharge was not effected within the framework of due process when she was notified that IRS was considering disciplining her for "conduct unbecoming" an IRS employee (in that she shot at her son-in-law) but her discharge was upheld on appeal by the government's administratively convicting her of assault with intent to murder.

Congress has required that an agency, before removing a "preference eligible employee" (such as Mrs. Fugate) must give the employee advance notice, "stating *any and all reasons, specifically and in detail,* for the proposed action." 5 U.S.C. § 7512(b)(1), emphasis added. The Internal Revenue Manual expands on the statutory requirement in § 1986.-21(d). This regulation requires that the stated reasons for the proposed adverse action must reflect some recognizable offense and suggests that the notice cite the conduct rule of the IRS or Treasury Department (if any) which is absolutely applicable to the alleged misconduct. Further, this regulation directs:

> Unless the employee has been actually convicted of a violation of Federal, State or local statute, do not charge him with such violation or cite the statute. However, the employee may be charged with an act which is forbidden by statute.

While the letter to Mrs. Fugate from Mr. Campbell carefully refrained from accusing her of a specific crime, the IRS was, as we have seen, considerably less inhibited later—even accusing her of plotting the commission of the "perfect crime." Whenever the IRS suffered a setback, it simply bolstered its position by amplifying its charges against Mrs.

Fugate and tried to explain away her nonprosecution by local authorities by claiming she had powerful friends among the "courthouse gang," to quote Mr. Hunter. This same explanation was advanced in Commissioner Thrower's letter to the CSC and in the government's brief in this Court. It is incongruous for the government, in this case, to ask the Court to look behind a prosecutor's motives when the same government unsuccessfully has taken the opposite stance in this Court in the pending case of United States v. Osorio, et al. (CR 3–2811–C) and when the law of this circuit is clearly to the contrary, at least as far as federal prosecutions are concerned. United States v. Cox, 342 F.2d 167 (5th Cir.), cert. denied, 381 U. S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965). Beginning with the hearing before Mr. Taylor and at every succeeding stage, the IRS has hurled at Mrs. Fugate accusations of specific violations of criminal statutes not included in the original charge. Such a variance violates the express terms of Internal Revenue Manual §§ 1986.21(d)(4) and 1986.-3(2)(c) and does not, as the statute requires, fit within the framework of due process.

■ Mrs. Fugate is entitled to a declaratory judgment that her removal from federal employment was unlawful; she also is entitled to an order directing that she be reinstated to her position as tax technician with the IRS as of February 28, 1969, the date of her unlawful removal, together with the restoration of all rights, benefits, and privileges that would have accrued from continuous service and pack pay computed in accordance with 5 U.S.C. § 5596. Mrs. Fugate also is entitled to recover the costs of this action.

Plaintiff's attorney is requested to submit to the Court a proposed judgment, preferably with defendants' approval as to form.

This memorandum opinion is submitted in lieu of findings of fact and conclusions of law.